IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 3:21-CR-141-004 |
| | ) |
| WAEL JIBAWI, | ) |
| | ) |
| *Defendant*. | ) |

## UNITED STATES' POSITION ON SENTENCING

The United States of America, through undersigned counsel, submits the following position regarding the sentencing of defendant WAEL JIBAWI. The United States has no objections to the Presentence Report (Dkt. 126) and concurs with its calculation of a Sentencing Guidelines range of 121 to 151 months' imprisonment on Counts One and Six, and 60 months' restricted on Count Three. As explained below, the Court should impose a sentence at the mid-point of the applicable guideline range on Counts One and Six, to be served concurrently to the restricted guideline sentence of 60 months on Count Three. Such a sentence is sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## Discussion

During sentencing, federal courts must follow a multistep process that analyzes both procedural and substantive concerns. First, the court must correctly calculate the applicable Guidelines range. *See Gall v. United States*, 552 U.S. 38, 49 (2007). Second, "the court must determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States*

*v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011) (internal quotation marks omitted). To the extent the Court deems some deviation from the Guidelines range appropriate, the Court must give serious consideration to the extent of the deviation and must adequately explain it "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 365 (internal quotation marks omitted). In all events, the Court must impose a sentence that takes into consideration the factors listed under 18 U.S.C. § 3553(a). *See id.* at 364.

## I. THE PRESENTENCE REPORT CORRECTLY CALCULATES THE APPLICABLE GUIDELINES RANGE.

The United States has no objections to the Presentence Investigation Report (PSR). The PSR correctly calculates a base offense level of 7 and a 16-level enhancement for a loss amount of more than $1.5 million and less than $3.5 million. PSR ¶¶ 32-33. In addition, the PSR includes four specific offense characteristics enhancements. *First*, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), the defendant's offense level is increased by two levels because the offense involved 10 or more victims. *Id.* ¶¶ 24, 34. *Second*, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), the defendant's offense level is increased by two levels because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. PSR ¶ 35. *Third*, pursuant to U.S.S.G § 2B1.1(b)(11)(C)(ii), the defendant's offense level is increased by two levels because the offense involved the possession of five or more means of identification that were unlawfully produced from another means of identification. *Id.* ¶¶ 23, 36. *Fourth*, pursuant to U.S.S.G. § 2B1.1(b)(18), the defendant's offense level is increased by two levels because he was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information. *Id.* ¶ 37. Finally, the PSR includes a 4-level enhancement pursuant to

U.S.S.G. § 3B1.1(a) because the defendant was the organizer or leader of the criminal activity, which involved five or more participants. PSR ¶¶ 26, 39. As a result, the PSR calculates a total offense level of 32 (after a 3-level reduction for acceptance of responsibility[1]). With a criminal history category of I, the defendant's advisory Guidelines range is 121 to 151 months' imprisonment on Counts One and Six. That range is restricted by the statutory maximum penalty of 60 months on Count Three.

## II. THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553 SUPPORT A MID-GUIDELINE RANGE SENTENCE.

Under 18 U.S.C. § 3553(a), the Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in § 3553(a)(2). Specifically, the Court's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Section 3553(a) further "provides that in determining a particular sentence, a sentencing court must consider seven enumerated *factors*," *United States v. Shortt*, 485 F.3d 243, 247 (4th Cir. 2007) (emphasis in original), including the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines, any pertinent policy statements, the need to avoid unwarranted sentence disparities among defendants with similar

---

[1] By separate filing, the United States moves the Court for an additional reduction to the defendant's offense level pursuant to U.S.S.G. § 3E1.1(b).

Page **3** of **18**

records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense, 18 U.S.C. § 3553(a)(1), (3)-(7).

"The sentencing *purposes* identified in § 3553(a)(2)(A) [through] (D) are the four foundational purposes of sentencing that have long prevailed throughout [American] jurisprudence—(1) punishment, (2) deterrence, (3) incapacitation, and (4) rehabilitation." *Shortt*, 485 F.3d at 248-49 (citing Ilene H. Nagel, *Structuring Sentencing Discretion: The New Federal Sentencing Guidelines*, 80 J. Crim. L. & Criminology 883 (1990)) (emphasis in original). "[M]ost of the specified purposes [of sentencing] listed in [§ 3553(a)(2)] hardly connote less punishment." *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006). Indeed, the first three—respect for the law, just punishment, deterrence, and protection of the public—"certainly do not suggest leniency; only one listed purpose," rehabilitation, "has a softer tone." *Id.* at 58 n.3 (citing 18 U.S.C. § 3553(a)(2)). And, "[a]lthough still relevant," Congress and the Sentencing Commission have recognized that "th[is] fourth purpose … [is] insufficient, standing on its own, to justify a particular sentence." *Shortt*, 485 F.3d at 249 (citing S. Rep. No. 98-225, at 38 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221). Instead, the Senate Committee responsible for drafting the Sentencing Reform Act of 1984 "placed special emphasis on the first stated purpose—the need 'to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.* (citing S. Rep. No. 98-225 at 75). "As it observed, the first purpose 'should be reflected clearly in *all* sentences." *Id.* (emphasis in *Shortt*).

A sentence that fails to serve the purposes of sentencing outlined in § 3553(a)(2) is just as unreasonable as one that is greater than necessary to serve such purposes. *United States v. Dowell*, 771 F.3d 162, 176 (4th Cir. 2014) (quoting *Shortt*, 485 F.3d at 248).

### A. Nature and Circumstances of the Offense

On December 7, 2021, JIBAWI and five codefendants were named in an eighteen-count Indictment. PSR ¶ 1. On April 13, 2022, JIBAWI pled guilty to Counts One, Three, and Six of the Indictment, that is, Conspiracy to Commit Wire and Bank Fraud, in violation of 18 U.S.C. § 1349; Accessing a Protected Computer in Furtherance of Fraud, in violation of 18 U.S.C. §§ 1030(a)(4), (c)(3)(A), and 2; and Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2. *Id.* ¶¶ 2-4, 7.

#### *1. General Background.*

For more than five years, defendants conspired to defraud at least half dozen financial service providers through various and escalating means. First, conspirators applied to designate businesses that they and their family members owned as partner retailers, a designation that allowed those businesses to offer their customers retail financing through the targeted providers. Instead, conspirators used hundreds of stolen identities to obtain lease and credit card accounts to which they then charged thousands of dollars for purchases that did not actually occur, causing the targeted to providers to pay them hundreds of thousands of dollars they were not actually owed. To further defraud these providers, conspirators also created fictitious businesses ostensibly owned and operated by themselves and other people. These sham companies conducted no legitimate business and, instead, were used solely to induce the targeted providers to continue paying conspirators for retail purchases that never occurred.

As the scheme progressed, conspirators further targeted providers through computer intrusions in which they used social engineering to gain access to other businesses' accounts and then diverted payments intended for those businesses to themselves. In addition to

compromising accounts belonging to existing businesses, conspirators also assumed the identities of shuttered businesses in several states. As they did with their own businesses and the fake businesses created to further the scheme, conspirators applied to designate the shuttered businesses as partner retailers and, once approved, applied for and expended financing in the names of stolen identities.

Through this conduct, defendants used more than 1,000 stolen identities to defraud and attempt to defraud at least six financial service providers of at least $2.3 million in just under five years.

### 2. *JIBAWI's Role in the Offense.*

By all accounts, JIBAWI was the leader and organizer of this conspiracy. PSR ¶ 26. He approached relatives with existing furniture businesses and proposed using those businesses to carry out a financing fraud scheme. PSR ¶ 26(v). In other instances, he convinced conspirators, such as Yanal Khrisat, to create sham businesses for the same purpose. JIBAWI obtained the stolen identities used in the fraudulent financing applications and also used identities of former employees as aliases to perpetrate various frauds. *Id.* ¶ 26(iii)-(v). His conspirators' descriptions are corroborated by significant evidence tying him to these frauds, including I.P. addresses, phone numbers, and email addresses used in the commission of several offenses that resolved back to JIBAWI and his family businesses. *Id.* ¶ 26(vii). Similarly, those same I.P. addresses, phone numbers, and email addresses were used to socially engineer access to the Bernie & Phyl West Creek accounts. *Id.* ¶ 26(i)-(ii), (vii). Indeed, in addition to identifying JIBAWI as the only conspirator with the technical knowledge to carry out the intrusion that followed, conspirators universally identified him as the individual captured in the social engineering calls made to West Creek. *Id.*

Consistent with conspirators' descriptions, JIBAWI was traceably involved in more fraud schemes than any other defendant, including and especially, the frauds that bookended the conspiracy—the initial West Creek fraud in 2017 and the most recent fraud scheme against Kafene in December 2021. PSR ¶¶ 17-20, 26(vi). His conspirators reported that JIBAWI also demanded at least 50 percent of the proceeds generated by these frauds, typically provided to him in cash. *Id.* ¶ 26(v). Because he was frequently paid in cash, he was also likely involved in schemes to which he has not been traceably linked. *Id.* But, even considering only those frauds to which he is linked by a traceable payment, JIBAWI is responsible for a broader scope of criminal activity and more significant losses than any other defendant. Specifically, JIBAWI profited from the following schemes:

| Fraud | Total Intended Loss | JIBAWE Gain[2] |
|---|---|---|
| April-June 2017 Golden Mattress fraud against West Creek<br><br>PSR ¶ 22 | $40,265.00 | Unknown |
| January-February 2018 West Creek Intrusion<br><br>PSR ¶¶ 16.27-30, 22 | $138,928.19 | $4,000.00 |
| January-June 2018 Xclusive fraud against Synchrony<br><br>PSR ¶¶ 16.31-32, 22 | $835,823.00 | $11,290.00 |

---

[2] JIBAWI gain is calculated using the amounts directly transferred to JIBAWI, checks written to JIBAWI and his businesses, or cash withdrawals done from accounts with JIBAWI as signatory. This does not account for cash that other conspirators withdrew and may have provided to him for setting up the merchant relationships with the financing companies or facilitating the fraudulent applications.

| Fraud | Total Intended Loss | JIBAWE Gain[2] |
|---|---|---|
| August 2018-April 2019 Moe's Furniture fraud against Synchrony<br><br>PSR ¶¶ 16.33-36, 22 | $562,137.00 | $20,615.00 |
| September 2019-February 2020 Roseland Furniture fraud against Synchrony, West Creek, and Greenwave<br><br>PSR ¶¶ 16.37-47, 22 | $77,777.00 (Synchrony)<br>$11,615.00 (West Creek)<br><br>$235,394.81 (Greenwave) | $29,570.00 (Synchrony)<br><br>$118,870.00 (Greenwave) |
| December 2021 Glamour Home Furnishings fraud against Kafene<br><br>PSR ¶¶ 17-22 | $111,979.93 | $83,580.00 |
| December 2021 Golden Mattress Plus fraud against Kafene<br><br>PSR ¶¶ 17-22 | $97,960.30 | $97,960.30 |
| December 2021 Modern Home fraud against Kafene<br><br>PSR ¶¶ 17-22 | $112,889.85 | $107,780.00 |
| December 2021 Wow Mattress fraud against Kafene<br><br>PSR ¶¶ 17-22 | $134,259.85 | $48,682.00 |
| **TOTAL** | **$2,359,029.93** | **$522,347.30** |

It is beyond dispute that the instant offenses could not have occurred without JIBAWI's instigation and assistance. He was the architect and director of this scheme, relentlessly pursuing the targeted financial providers in new and evolving ways. With each iteration, JIBAWI developed ever more sophisticated means of defrauding these entities in the names of others. First, he recruited family members with legitimate businesses to

facilitate fraudulent lease and credit card applications. Next, he recruited friends, like Yanal Khrisat, to create sham businesses for use in the scheme. Hiding behind these entities and assumed aliases, JIBAWI socially engineered access to other business's existing accounts and, through several computer intrusions, diverted funds owed those entities to himself and other conspirators. JIBAWI then created still more businesses in the names of others, including his former employees. After cycling the scheme through various legitimate and sham businesses, JIBAWI found yet another way to continue defrauding the targeted providers—assuming the corporate identities of shuttered businesses located throughout the United States.

By virtue of his leading role in these crimes, JIBAWI had to know that he and his co-conspirators were causing substantial hardship to their victims. To date, over 1,000 identity theft victims have been identified, along with the six financing companies defrauded. *Id.* ¶ 24. In total, the specific fraud schemes that JIBAWI was traceably involved in resulted in nearly $1.8 million in actual losses to the financing company victims. PSR ¶ 22. Although likely severely understated due to the role that he played and the cash payments he reportedly received, investigation confirmed that JIBAWI personally obtained at least $500,000 of the funds that conspirators obtained through the above-described schemes. *Id.*

Unlike other conspirators, there is nothing about JIBAWI's conduct that mitigates his involvement in this scheme. He was its leader and organizer. He obtained the stolen identities. He facilitated each fraud. He evolved the scheme to ensure its continued success. And, unlike some of his co-conspirators, JIBAWI continued stealing identities[3] to defraud the

---

[3] JIBAWI even admitted in recorded calls with West Creek as far back as 2017 that angry citizens were coming into Golden Mattress complaining that he stole their information and

targeted providers from the inception of the fraud in early 2017 until his arrest for the instant offense in January 2022. His criminal conduct was deliberate, sophisticated, and persistent. It was not the rash decision of an immature actor.

The only potential mitigator for JIBAWI is his quick acceptance of responsibility following his arrest. In consideration of his plea and agreement to entries of forfeiture and restitution orders, the United States submits that a mid-point, rather than high-end, guidelines sentence is appropriate.

### B. History and Characteristics of the Defendant

Nothing in JIBAWI's background explains or mitigates his involvement in the instant offense. He was born and raised in Illinois in an intact family. PSR ¶ 55. His family was supportive of JIBAWI and his four younger siblings. *Id.* ¶ 57. Although they struggled financially at times, all of JIBAWI's needs were met. *Id.* He has never been married and has no children. *Id.* ¶ 58. He is engaged to his partner of three years, with whom he resides. *Id.* JIBAWI is a college graduate who has been employed consistently in the furniture business since 2015. *Id.* ¶¶ 62-65. He continues to operate Golden Mattress Plus, one of the businesses he used to commit these crimes. *Id.* ¶ 64.

Apart from chronic bronchitis, which he manages with medication, JIBAWI is in good physical health. PSR ¶ 59. He reports no history of mental or emotional health problems, but does have a history of marijuana abuse and a conviction for underage possession of alcohol. *Id.* ¶¶ 47, 61. It would appear that JIBAWI could benefit from substance abuse treatment.

---

wanted to file police reports against JIBAWI reporting fraud.

A mature adult, JIBAWI organized this scheme in his mid-twenties after graduating with his bachelor's degree in criminal justice, as he explained during his plea colloquy. At the time, he had one prior misdemeanor conviction for underage possession of alcohol and had been arrested one other time in connection criminal property damage. PSR ¶¶ 47, 52. As he led and evolved this scheme, JIBAWI had additional contacts with law enforcement resulting in his arrest on two occasions for drug and firearm possession. *Id.* ¶¶ 53-54. He, more than any other defendant, was well positioned to lead a successful and law-abiding life. He was able to obtain a college education without incurring substantial student loan debt. *Id.* ¶¶ 63, 66. After working at a furniture store for several years, he took over one of his father's businesses, who seemingly conducted legitimate business prior to his son's involvement. Instead of capitalizing on these significant advantages, JIBAWI organized and led the instant conspiracy for nearly five years until his arrest in this case.

### C. Seriousness of the Offense

The scope of fraud perpetrated against identity theft victims is truly enormous. According to the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, in 2018 alone, an estimated 23 million people (9% of all U.S. residents aged 16 and older) reported they were victims of identity theft in the prior 12 months.[4] For victims with a known loss of $1 or more, their financial losses totaled $15.1 billion. *Id*. The defendants' extensive fraud scheme victimized over 1,000 people in whose names the defendants opened new financing accounts or credit cards without their authorization. PSR ¶ 24.

---

[4] Erika Harrell, *Victims of Identity Theft, 2018*, April 2021, https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (hereinafter "BJS Report").

Being the victim of identity theft is truly a life altering experience even if one does not suffer any quantifiable monetary loss. In addition to potential financial harm, many victims of identity theft suffer devastating emotional trauma from these crimes, resulting in feelings of anger, fear, anxiety, depression, confusion, and more as outlined in the Victim Impact Statements attached to the PSR (Dkt. 126-1). Indeed, the Bureau of Justice Statistics estimates that about 50% of identity theft victims in whose name a new account was opened experience moderate or severe distress as a result of the crime. BJS Report at 11. The victims in this case also repeatedly identify the toll that this crime had—and in some instances continues to have—on their quality of life and that of their families, such as low credit impacting available housing options (Pages 64, 75-77), struggling to regain financial independence (Page 80), and struggling to get other forms of financial assistance due to low credit scores (Page 67).

In addition to the emotional toll, and detriment to their quality of life, victims of identity theft—especially those who are victimized by fraudsters opening new accounts in their names— routinely spend significant amounts of time resolving associated financial and credit problems. Victims of identity theft are advised to follow a litany of time-consuming measures to protect themselves including: placing a fraud alert with the credit reporting agencies, creating an identity theft file, investigating their legal rights, reporting the identity theft to law enforcement and the Federal Trade Commission, placing a credit freeze, ordering and reviewing credit reports and disputing charges, contacting the Internal Revenue Service, contacting the Social Security Administration, and investigating potential civil remedies.[5]

---

[5] *Taking Action: Identity Theft Victim Recovery Checklist*, National Center for Victims of Crime, https://victimsofcrime.org/wp-content/uploads/2020/08/FINRA-Taking-Action-

The Bureau of Justice Statistics estimates that these types of identity theft victims spend an average of 14 hours resolving these issues, with some taking as long as over six months to reach a resolution. BJS Report at 12. The Victim Impact Statements detail the exorbitant amount of time spent victims spent reporting these offenses to police, credit bureaus, creditors, etc. in attempts to clear their names, as well as various other remediation steps they had to take to unwind the harm of the fraud and secure their identity from future fraud, such as closing accounts (Pages 8, 13, 73).

In addition to the defendants' identity theft victims, six financial institutions were victimized by the defendants' fraud conspiracy, including four that were traceably defrauded by JIBAWE. PSR ¶ 22. The financing companies defrauded by JIBAWI and other conspirators paid out nearly $1.8 million for fraudulent financing applications traceable to JIBAWI. *Id*. In addition to the funding they paid in connection with these applications, the financing companies were further harmed by the significant business interruption and financial expenditures associated with the investigation into the fraudulent conduct, a harm that can never fully be quantified. *See, e.g*., West Creek Victim Impact Statement. The fraud was especially impactful on the smaller financing companies such as Greenwave Financial, a small startup that had just opened its doors six months prior to being victimized by the conspirators, and almost did not survive as a result. Greenwave Finance Victim Impact Statement (Dkt. 124-1 at 15-52).

Although the defendants have all agreed to restitution and forfeiture, based on the financial information included in the PSR, it is unlikely that JIBAWI and/or his co-

---

Checklist-Identity-Theft-final.pdf.

conspirators will ever be able to make the financial institutions whole for the losses they suffered. PSR ¶¶ 65-66 (reflecting a negative monthly cash flow of over $1,500.00). Put simply, when financial service providers suffer frauds of these magnitudes, it necessarily raises the cost of borrowing for everyone.

There can be no dispute that the defendant's offense of conviction is a serious one. And while his involvement in the conspiracy was less than the ringleader, a sentence of imprisonment at the mid-point of the Guidelines is required to adequately punish his conduct.

### D.   Need to Deter Future Criminal Conduct and Promote Respect for the Law

A sentence at the mid-point of the applicable guideline range will also achieve the goals of specific and general deterrence while also promoting respect for the law.

JIBAWI organized, led, and evolved a crime that had significant consequences for hundreds of identity theft victims, as well as financial institutions that provide much needed financing for underprivileged populations that otherwise would be unable to afford large purchases. JIBAWI understood that the fraudulent funds received were the result of bogus financing fraud applications in the name of unwitting identity theft victims, because he was responsible for stealing their identities and submitting the fraudulent applications. Further, as the owner of at least one business used to perpetrate these frauds, JIBAWI knew that he had not sold any of the items purportedly purchased with that financing. Further, JIBAWI is the only defendant who still owns one of the subject furniture businesses involved in the present fraud, and thus requires specific deterrence to prevent JIBAWI from defrauding future customers or financing companies. A Guideline range sentence of imprisonment will provide sufficient deterrence from future criminal conduct by this defendant.

The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized."). Absent a term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976). ). Further, "because economic and fraud-based crimes are 'more rational, cool and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Additionally, given the prevalence of identity theft, and the steep and unquantifiable harm, emotional trauma, and stress suffered by those who have had their personal identifying information compromised and used to satisfy the greed of fraudsters, general deterrence is particularly apt in cases such as JIBAWI's.

A sentence of imprisonment at the mid-point of the Guidelines is necessary to send the appropriate message to both JIBAWI and others that those who engage in this conduct will be caught and punished significantly.

E.  **Need to Protect the Public from the Defendant's Future Criminal Conduct**

A mature adult with significant advantages, JIBAWI organized and led a broad and enduring conspiracy to defraud multiple financing companies of millions of dollars. The fact that his history and circumstances did little to deter him from these serious offenses

demonstrates the need for a guideline range sentence to provide adequate protection to the public from future criminal conduct by the defendant.

### F. Substance Abuse and Mental Health Treatment or Vocational Training

As noted above, the defendant has no known mental health or vocational training needs. It does appear that he would benefit from substance abuse treatment, which the Bureau of Prisons is able to provide.

### G. Need to Avoid Unwarranted Sentencing Disparities

There is no compelling reason to treat JIBAWI differently from those who have engaged in comparable criminal conduct. His offense fits squarely within the recommended Guidelines range. And, a sentence at the mid-point of that range is appropriate.

### CONCLUSION

For the reasons discussed above, the United States respectfully requests that the Court impose a sentence of 136 months' imprisonment on Counts One and Six and a concurrent 60-month sentence on Count Three. Such a sentence is sufficient, but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:   /s/ Kaitlin G. Cooke
Kaitlin G. Cooke
VSB # 83935
Carla Jordan-Detamore
VSB # 85934
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Telephone: (804) 819-5400

                                      Email: kaitlin.cooke@usdoj.gov
                                                    carla.jordan-detamore@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **October 5, 2022**, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties of record.

I also hereby certify that on October 5, 2022, I emailed a true and accurate copy of this Position on Sentencing to the following:

Diane DeLuca
United States Probation Officer
Suite 1150
701 East Broad Street
Richmond, Virginia 23219

                              Respectfully submitted,

                              JESSICA D. ABER
                              UNITED STATES ATTORNEY

By:   /s/ *Kaitlin G. Cooke*
        Kaitlin G. Cooke
        VSB # 83935
        Carla Jordan-Detamore
        VSB # 85934
        Assistant United States Attorneys
        United States Attorney's Office
        919 East Main Street, Suite 1900
        Richmond, VA 23219
        Telephone: (804) 819-5400
        Email: kaitlin.cooke@usdoj.gov
                  carla.jordan-detamore@usdoj.gov